```
                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF GEORGIA
                        ATLANTA DIVISION
```

LATRICE MCLENDON, LINA PITTS,
MARK HAGL, FLOYD BALDWIN, and
NANCY PAVON on behalf of
themselves and all others
similarly situated,

       Plaintiffs,           CIVIL ACTION

      v.               NO. 1:06-CV-1770-CAP

PHILIP SERVICES CORPORATION
d/b/a GEORGIA RECOVERY SYSTEMS
and/or PSC RECOVERY SYSTEMS;
AMVAC CHEMICAL CORPORATION;
and JOHN DOES 1-10,

       Defendants.

O R D E R

    This matter is before the court on defendant AMVAC Chemical
Corporation's motion to dismiss [Doc. No. 36].

Factual Background

    According to the complaint, defendant PSC Recovery Systems,
Inc. d/b/a Georgia Recovery Systems ("PSC") owns and operates a
waste treatment facility in Fairburn, Georgia, that is engaged in
the receipt, storage, transfer, treatment, and disposal of
industrial wastes. Defendant AMVAC Chemical Corporation ("AMVAC")
is an agricultural products company that manufactures, among other
things, pesticides, fungicides, and herbicides at its plant in
Axis, Alabama.

    In May and June 2006, AMVAC transported multiple shipments of
industrial waste water from its Alabama plant to PSC's Fairburn

facility for treatment and disposal. AMVAC described the waste shipments as "MOCAP Wash Water, N.O.S., Liquid, Non Toxic." MOCAP wash water is a waste water that results from the manufacture of MOCAP, a pesticide whose active ingredient is Ethoprop. It is generally described as a clear, colorless, aqueous salt solution containing trace amounts of hazardous chemicals Ethoprop and Propyl Mercaptan and having an onion-like odor. MOCAP wash water is considered both an immediate and a delayed health hazard under federal law. Ethoprop is toxic and a likely carcinogen. Propyl Mercaptan is an irritant that can cause adverse health effects including headaches, vomiting, nausea, and eye and throat irritation.

Some or all of the waste shipments by AMVAC to PSC in May and June 2006, though described as containing MOCAP wash water, actually contained a hazardous waste mixture with extremely high concentrations of Ethoprop, Propyl Mercaptan, and other hazardous substances. Despite the unusually strong odors emanating from the AMVAC shipments, PSC accepted the shipments and proceeded to treat and process some or all of the waste materials. PSC's alleged mishandling and mistreatment of the AMVAC shipments caused the release of hazardous and toxic substances, including Ethoprop and Propyl Mercaptan into the air, soil, and water surrounding PSC's Fairburn facility. PSC took no immediate steps to report the

release to local, state, or federal authorities or to otherwise warn the surrounding public of the potential health hazards associated with the release.

Beginning in May and June 2006, the plaintiffs and those similarly situated to them began smelling a strong, putrid, noxious onion-like odor in their communities. They also began experiencing various symptoms including but not limited to headaches, dizziness, vomiting, nose bleeds, diarrhea, rashes, and eye and throat irritation. The plaintiffs believe that their symptoms are caused by exposure to Propyl Mercaptan, Ethoprop, and other hazardous and toxic substances contained in AMVAC's shipments and released from PSC's Fairburn facility.

As a result of AMVAC and PSC's activities, on July 28, 2006, the plaintiffs filed this lawsuit on behalf of themselves and all other similarly situated persons. In their amended complaint, the plaintiffs assert the following four substantive claims against AMVAC: (1) continuing trespass, (2) continuing nuisance, (3) negligence, and (4) negligence per se. The plaintiffs also request injunctive relief directing AMVAC to cease waste shipments to PSC's Fairburn facility until such time as AMVAC's practices in the generation, transportation, and disposal of industrial and hazardous wastes fully complies with all applicable state laws, directing AMVAC to stop the flow of hazardous wastes from PSC's

Fairburn facilities into the environment, and directing AMVAC to investigate, identify, and remediate any hazardous substances found on the plaintiffs' properties.  In addition, in Paragraph 81 of the amended complaint, the plaintiffs state that they "may amend this Complaint to plead" various federal citizen suit causes of actions. The plaintiffs further ask the court to declare that AMVAC is liable to the plaintiffs for the "past, present, and future response costs, corrective action costs, and other damages suffered and incurred by plaintiffs and those similarly situated." Finally, the plaintiffs seek punitive damages, attorney's fees, costs, and expenses.

In the current motion, AMVAC moves the court to dismiss the plaintiffs' continuing trespass claim (Count I), the plaintiffs' continuing nuisance claim (Count II), and the plaintiffs' claim for injunctive relief (Count V).  AMVAC also moves the court to dismiss the plaintiffs' requests for "response costs," "corrective action costs," and the plaintiffs' "citizen suit" claims.

<u>Legal Analysis</u>

A.   <u>Standard of Review</u>

Generally, a claim should be dismissed under Rule 12(b)(6) only where it appears beyond a doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102

4

(1957).   When considering a motion to dismiss, the court must accept the facts pled as true and construe them in a light favorable to the plaintiffs.   See Covad Communications Corp. v. BellSouth Corp., 299 F.3d 1272, 1279 (11th Cir. 2002).   Thus, AMVAC can succeed in its motion to dismiss only if accepting the facts pled in the complaint as true, it appears beyond a doubt that the plaintiffs can prove no set of facts in support of their claims.

B.   Application of the Standard of Review to This Case

1.   The Plaintiffs' Continuing Trespass and Continuing Nuisance Claims

AMVAC first asks the court to dismiss the plaintiffs' continuing trespass and nuisance claims on the grounds that the plaintiffs have failed to state claims entitling them to relief. In particular, AMVAC contends that to state valid nuisance and trespass claims, the plaintiffs must allege that AMVAC has a legal right and is under a legal duty to terminate the cause of the injuries sustained by the plaintiffs.   Because the plaintiffs do not allege that AMVAC owned or operated PSC's facility, participated in the treatment and disposal activities, or had any control over the chemicals at the facility, AMVAC argues that the plaintiffs have failed to allege facts sufficient to support their continuing trespass and nuisance claims.

To support its argument, AMVAC relies, among other things, on the Georgia Supreme Court's decision in <u>Bodin v. Gill</u>, 216 Ga. 467, 117 S.E.2d 325 (1960).  In <u>Bodin</u>, the plaintiff sued the architects of a church whose design allegedly caused an increased flow of surface water to be discharged on the plaintiff's property. Because the architects had no legal right to go upon church property for the purpose of terminating the cause of the injury at the time that the lawsuit was filed, the Georgia Supreme Court held that it was error to grant an interlocutory injunction against the architects.  AMVAC argues that like <u>Bodin</u>, absent allegations that it had the legal right to abate the nuisance, it cannot be held liable for continuing nuisance or continuing trespass.

At the very least, <u>Bodin</u> stands for the proposition that AMVAC cannot be enjoined from the maintenance of a continuing trespass or nuisance based on the allegations in the amended complaint.  A harder question, however, is whether AMVAC could be liable for damages on a continuing nuisance or trespass theory.  <u>Bodin</u> did not explicitly address this issue.

The plaintiffs claim that AMVAC can be liable for continuing nuisance and trespass even though AMVAC does not have a legal right to abate the nuisance because AMVAC's actions contributed to causing the nuisance.  The plaintiffs primarily rely on <u>Sprayberry Crossing Partnership v. Phenix Supply Co.</u>, 274 Ga. App. 364, 617

6

S.E.2d 622 (2005).  In <u>Sprayberry</u>, a shopping center owner brought nuisance and trespass claims against Phenix, the supplier of perchlorethylene ("perc") to a dry-cleaning facility in the shopping center.  The evidence at trial showed that Phenix's trucks directly spilled perc into the parking lot and inside the dry cleaners.  The Georgia Court of Appeals reversed the trial court's grant of judgment notwithstanding the verdict to Phenix after determining that there was sufficient evidence to establish causation; thus, Phenix could be liable for nuisance and trespass. The plaintiffs claim that the AMVAC, like Phenix, contributed to causing the nuisance by mislabeling its MOCAP wash water; thus, they have sufficiently stated continuing nuisance and trespass claims against AMVAC.

After much deliberation, the court will dismiss the plaintiffs' continuing nuisance and trespass claims against AMVAC. As noted above, at most, the plaintiffs have alleged that AMVAC mislabeled the MOCAP wash water that it sent to PSC and that the mislabeling contributed to PSC's negligent mishandling of the MOCAP wash water.  Unlike the <u>Sprayberry</u> case, however, the plaintiffs have not alleged that AMVAC was in control of the MOCAP wash water when the injury complained of by the plaintiffs occurred, nor do the plaintiffs allege that AMVAC knew PSC was likely to create a nuisance.  The plaintiffs also do not allege that AMVAC owned or

controlled PSC's Fairburn facility or had the legal right to abate the nuisance once it was created.  While the court has no quarrel with AMVAC's potential responsibility, the proper theory of recovery is negligence and not continuing nuisance or continuing trespass.

      2.   <u>The Plaintiffs' Claim Seeking Injunctive Relief</u>

In Count V of the Amended Complaint, the plaintiffs seek an order that, among other things, (1) directs AMVAC to cease waste shipments to PSC's Fairburn facility; (2) directs PSC to cease operations either permanently or until such time as the facility is brought into compliance with all applicable state and federal laws; (3) directs both defendants to stop the flow of hazardous, offensive and other substances and waste from the facility; (4) directs both defendants to investigate fully the identity, presence, and movement of hazardous, offensive and other substances from the facility; (5) directs both defendants to identify, delineate, and remediate hazardous, offensive, and other substances from the facility; and (6) suspends or revokes each defendants' respective local, state, and/or federal environmental permits.

AMVAC asks the court to exercise its discretion under the primary jurisdiction and <u>Burford</u> abstention doctrines and abstain from adjudicating this claim.  As support for its motion, AMVAC points out that on June 30, 2006, the Georgia Environmental

Protection Division ("EPD") investigated odors at PSC's Fairburn facility.  Based on its investigation, as well as investigations conducted with the EPA, EPD issued Administrative Order No. 2075 on July 28, 2006.  Following negotiations between EPD and PSC, EPD superceded Administrative Order No. 2075 with Consent Order No. 2077 on August 11, 2006 ("Consent Order").  The Consent Order imposes numerous requirements on PSC.  For instance, it prohibits PSC from receiving mercaptan-containing wastes or any wastes that create odor problems.  It also requires PSC to submit plans to EPD to reduce or eliminate future odor incidents, modify PSC's waste storage areas, and modify its waste storage practices.  Although the Consent Order is not directed at AMVAC, AMVAC argues that the court should abstain from awarding any injunctive relief in this case given the investigative and oversight activities undertaken by EPD.

> a.   <u>Burford Abstention and Primary Jurisdiction</u>

The Supreme Court first articulated the <u>Burford</u> abstention doctrine in <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315, 63 S. Ct. 1098 (1943). In a later case, the Supreme Court summarized <u>Burford</u> abstention as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) where there are difficult questions of state law bearing on policy questions of

      substantial public import whose importance transcends the
result in the case then at bar; or (2) where the exercise
of federal review of the question in a case and in
similar cases would be disruptive of state efforts to
establish a coherent policy with respect to a matter of
substantial public concern.

New Orleans Public Service, Inc. v. Council of the City of New

Orleans, 491 U.S. 350, 361, 109 S. Ct. 2506, 2514 (1989) (citations

and internal quotations omitted).    The purpose of Burford

abstention is to "protect [ ] complex state administrative

processes from undue federal interference." Id. at 362, 109 S. Ct.

at 2515; Siegel v. LePore, 234 F.3d 1163, 1173 (11th Cir. 2000).

    As with the concept of Burford abstention, the primary

jurisdiction doctrine is similarly concerned with protecting the

administrative process from judicial interference.    United States

v. Western Pacific Railroad Co., 352 U.S. 59, 63, 77 S. Ct. 161,

165 (1956); Boyes v. Shell Oil Products Co., 199 F.3d 1260, 1265

(11th Cir. 2000).    It is "a doctrine specifically applicable to

claims properly cognizable in [federal] court that contain some

issue within the special competence of an administrative agency."

Reiter v. Cooper, 507 U.S. 258, 268, 113 S. Ct. 1213, 1220 (1993)

(citations omitted).    Even though the court is authorized to

adjudicate the claim before it, the primary jurisdiction doctrine

dictates that a specialized agency be given the opportunity to

resolve the dispute. Western Pacific Railroad Co., 352 U.S. at 64,

77 S. Ct. at 165.  Accordingly, "the judicial process is suspended pending referral of such issues to the administrative body for its views."  Id.; Loggerhead Turtle v. Volusia County Council, 896 F. Supp. 1170, 1175 (M.D. Fla. 1995), aff'd on appeal, 148 F.3d 1231 (11th Cir. 1998).  The main justifications for the rule of primary jurisdiction are the expertise of the agency deferred to and the need for a uniform interpretation of a statute or regulation. Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 303-04, 96 S. Ct. 1978, 1986 (1976).  However, "courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants." Mississippi Power & Light Co. v. United Gas Pipeline, Co., 532 F.2d 412, 419 (5th Cir. 1976).

        b.    Application to AMVAC's Contentions

    Applying the foregoing principles to AMVAC's arguments against federal jurisdiction, the court declines to abstain from awarding injunctive relief on the basis of primary jurisdiction or Burford abstention   doctrines.    Although   the   court   admits   that determinations   regarding   air   contamination   and   remediation techniques are not dealt with by the court on a daily basis, that fact alone is not a sufficient basis for abstaining.  It must be shown that courts in general lack competence to efficiently and effectively resolve the issue.  The question of how to fashion

                                11

relief sufficient to remediate an environmental hazard is not so complex as to foreclose its consideration by the judiciary.

Nor is it a foregone conclusion that any order of this court will interfere with or actually conflict with EPD's resolution of the issue. See Mississippi Power & Light, 532 F.2d at 419 ("The court in instituting injunctive relief may be able to provide adequate flexibility to coordinate its decision with subsequent regulatory action."). The Consent Order and the Administrative Order provide ample evidence of the agency's institutional attitudes and remediation expectations with respect to PSC's Fairburn facility, which the court can carefully consider before ordering relief. Id. ("[W]hen the agency's position is sufficiently clear or nontechnical . . . courts should be very reluctant to refer."). Additionally, the court could ask for EPD comments before fashioning any finalized judgment, or the court could modify any injunctive relief upon a decision of the agency regarding the Consent Order.[1]

Given that the court has a "virtually unflagging obligation" to exercise jurisdiction, abstention is disfavored. See Lisa, S.A.

---

[1] The court also notes that the Consent Order is directed to PSC, not AMVAC. This motion to dismiss, however, was filed by AMVAC and was not joined in by PSC. Thus, there is little possibility of a conflict between the Consent Order and any order of the court concerning AMVAC.

v. Mayorga, 149 Fed. Appx. 901, 903 (11th Cir. 2005) (concluding that the district court erred in staying the case in favor of a state court action and stating that federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them."). Because the risk of conflicting decisions is minimal and the court is equipped to analyze the extent to which specific injunctive measures are necessary, the court declines to apply the Burford abstention and primary jurisdiction doctrines to the present suit.

    3. <u>The Plaintiffs' Claims for Response Costs and Corrective Action Costs</u>

AMVAC next asks the court to dismiss the plaintiffs' claims for "response costs" and "corrective action costs" because the plaintiffs have not asserted claims pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. or the Georgia Hazardous Site Response Act ("HSRA"), O.C.G.A. § 12-8-90 et seq. Although the plaintiffs admit that they have not asserted a CERCLA or a HSRA claim, the plaintiffs contend that the terms "response costs" and "corrective action costs" are not limited to CERCLA and HSRA claims. Instead, the plaintiffs contend that they may be entitled to the costs of removing hazardous substances from their property under state common law.

The court is not aware of any case using the terms "response costs" or "corrective action costs" in conjunction with a state common law claim, as opposed to a CERCLA or a HSRA claim. Nevertheless, in view of the short amount of time between the incident and the filing of this complaint as well as the ongoing nature of the plaintiffs' investigation into the damages allegedly caused by the emissions, the court will allow the plaintiffs to continue to assert damages based on the costs they may incur if forced to remove hazardous substances from their properties.

4.   The Plaintiffs' Citizen Suit Claims

Finally, AMVAC asks the court to dismiss Paragraph 81 of the amended complaint which states that the plaintiffs "may amend" their complaint to assert various citizen suit claims such as a CERCLA claim, a Clean Water Act claim, a Resource Conservation and Recovery Act claim, a Clean Air Act claim, and a Emergency Planning and Community Right to Know Act claim.  AMVAC argues that the plaintiffs cannot assert any citizen suit claims because the plaintiffs have not provided AMVAC with the requisite written notice.  To the extent that Paragraph 81 merely states that the plaintiffs may assert such claims, AMVAC argues that Paragraph 81 is immaterial.

There is no need for the court to dismiss the claims set out in Paragraph 81 of the Amended Complaint because it is clear that

the plaintiffs are <u>not</u> presently asserting those claims against AMVAC.  If the plaintiffs desire to assert those claims against AMVAC in the future, the plaintiffs will need to seek leave of the court or consent from AMVAC.  Fed. R. Civ. P. 15(a).  Accordingly, the fact that the plaintiffs have not yet provided AMVAC with the statutorily required notice is immaterial.

Similarly, there is no need to strike Paragraph 81 of the amended complaint.  Its presence does not prejudice AMVAC because it does not assert anything against AMVAC.  <u>McNair v. Monsanto Co.</u>, 279 F. Supp.2d 1290, 1298 (M.D. Ga. 2003) ("Unless matters stricken have no possible relationship to the controversy and may prejudice the other party, motions to strike are usually denied.").

Conclusion

For the reasons discussed above, the court GRANTS, IN PART, and DENIES, IN PART, AMVAC's motion to dismiss [Doc. No. 36].  The motion is GRANTED to the extent that the court will dismiss the plaintiffs' <u>continuing</u> trespass claim against AMVAC and the plaintiffs' <u>continuing</u> nuisance claim against AMVAC.  The motion is otherwise DENIED.

SO ORDERED, this <u>21st</u> day of December, 2006.


/s/ <u>Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge

15